Board Trustees House of Reform ·v. City of Lexington.

CASE 15—ACTION BY BOARD OF TRUSTEES OF HOUSE OF REFORM
AGAINST CITY OF LEXINGTON TO COMPEL DEFENDANT· TO MAKE
PROVISIONS FOR PAYING AN APPROPRIATION—DEC. 3.

# Board of Trustees House of Reform v. City of Lexington.

### APPEAL FROM FAYETTE CIRCUIT COURT.

JUDGMENT FOR DEFENDANT AND PLAINTIFF APPEALS.    REVERSED.

MUNICIPAL CORPORATIONS—VALIDITY OF APPROPRIATION TO SECURE LO-
CATION OF HOUSE OF REFORM.

Held:    1. Under Constitution, sec. 179, providing that the general
assembly shall not authorize any county or city to "appropriate
any money for, or loan its credit to, any corporation, associa-
tion or individual, except for the purpose of constructing or
maintaining bridges, turnpike roads or gravel roads; provided,
if any municipal corporation shall offer to the Commonwealth
any property or money for locating or building a capitol, and
the Commonwealth accepts such offer, the corporation may
comply with the offer," does not prohibit a city authorized by
its charter to erect and maintain a house of correction and a
house of refuge from making an appropriation to secure the
location near the city of a State house of reform to which it
may send its youthful offenders; that privilege being a suffi-
cient consideration for the appropriation, though other cities
of the same class have the same privilege, as the privilege is
made more valuable to it than to other cities by the proximity
of the institution.

2. Whatever doubts exist as to the constitutionality of such an ap-
propriation must be resolved in favor of its constitutionality.

FORMAN & FORMAN AND WM. WORTHINGTON, ATTORNEYS FOR
APPELLANT.

### POINTS AND AUTHORITIES.

1. While it is true a municipal corporation can only exercise powers
granted in express words; second, those necessarily or fairly
implied in or incident to powers expressly granted, and, third,
those essential to the declared objects and purposes of the cor-
poration, not simply convenient, but indispensable.

Still, "it has long been an established principle in the law
of corporations, that they may exercise all the powers within

the fair intent and purpose of their creation, which are reasonably proper to give effect to powers expressly granted. In doing this, they must (unless restricted in this respect) have a choice of means adapted to ends, and are not to be confined to any one mode of operation." Dillon on Municipal Corp. (3d Ed.), sec. 115; Dillon on Municipal Corp. (3d Ed.), sec. 91; Dillon on Municipal Corp. (3d Ed.), sec. 446; City of Coldwater v. Tucker (Mich.), 24 Am. Rep., 601; Zigler v. Menges (Ind.), 16 Am. St. Rep., 357; Van Sicklen v. Burlington, 27 Vt., 70; State v. Cage, 34 La. Ann., 506; Daily v. Swope, 47 Miss., 367; Egyptian Levee Co. v. Hardin, 27 Mo., 495 (72 Am. Dec., 276); Cooley on Taxation, p. 129; Charter Cities Second Class in Kentucky, chap. 89, Kentucky Statutes, particularly section 3058 and subsecs. 3, 16, 25; Walker v. Jameson (140 Ind., 591), 49 Am. St. Rep., 230; Dillon, sec. 94, and cases there cited; McBean v. Fresno (112 Cal., 159), 53 Am. St. Rep., 191.

2. The appellee secured a valuable property right in procuring the permanent and convenient location of the houses of reform in Fayette county, which location is not common to the balance of the State, and in doing so acted wisely and economically, and courts will not interfere with such an exercise of discretion unless the action was founded in fraud or tends to the oppression of the taxpayers, and neither such objection is pretended to exist in this case. Dillon, sec. 94, and cases cited; Shepherd's .Fold, &c. v. Mayor of N. Y., &c., 96 N. Y. Court of Appeals, 137; City of Crawfordsville v. Braden (130 Ind., 149), 30 Am. St. Rep., 214; Jacksonville Elec. Light Co. v. Jacksonville (36 Fla., 229), 51 Am. St. Rep., 24; Rockebraudt v. Madison (9 Ind. Appeal, 227), 53 Am. St. Rep., 348; Cooley on Taxation, p. 103.

3. Express power to erect and maintain within or without the city, at her own proper cost, a house of refuge, carries with it the power to do less, provided in the doing less the same end is accomplished, upon the axiomatic principle the whole is greater than and inclusive of all its parts. Mt. Carmel v. Shaw (155 Ill., 37), 46 Am. St. Rep., 311.

4. The appropriation is not inhibited by any provision of the Constitution of Kentucky. Sections 177 and 179, Kentucky Constitution; Norman, Auditor, v. Ky. Board of Managers, 93 Ky., 541; Shepherd's Fold, &c. v. Mayor of N. Y., &c., 96 N. Y. Court of Appeals, 137.

5. Because appellee, for a short period of time, assumes to pay a greater rate of taxation for the support of the houses of reform than other taxing districts, presents no valid objection in view of the special benefits derived by appellee in the way of location, etc. County Judge of Shelby County v. Shelby R. R. Co.,

5 Bush, 225; Cooley on Taxation, p. 149, and cases cited; Cooley on Taxation, p. 622; Zigler v. Menges, 16 Am. St. Rep., 371, particularly note to said case, page 371, under title "Local Assessments," citing some fifty or more cases; Am. & Eng. Ency. Law, vol. 25, p, 99, first edition.

W. S. BRONSTON, CITY SOLICITOR, FOR APPELLEE.

In an agreed case submitted to the judge of the Fayette circuit court by the parties hereto, a decision was rendered holding that it was unconstitutional for the city of Lexington to appropriate or donate any sum of money to the trustees of the School of Reform of Kentucky, while the city stands ready and willing to pay the sum promised, provided such an act is permissible under the Constitution of the State. We regret to say that we do not believe such a step can legally be taken by any municipality under the laws of Kentucky.

Section 179 of the Constitution is so clear and emphatic on this proposition that we do not consider it necessary to file any extended brief, nor to refer to any additional authorities. That section makes it plain and unmistakable that only in one single instance, to-wit, that of locating and building the capitol, can a municipality collect or appropriate any funds for the purpose of aiding any company, association or corporation. If such an act be permitted with reference to the school of reform, then the same would be permitted with reference to the establishment of various "homes" that are being established by secret orders, asylums, orphan and other charitable institutions. We would be glad to know that the city could make the appropriation if it can legally be done, which we seriously doubt.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

The General Assembly of Kentucky, by an act approved March 21, 1896, appropriated $100,000, for the establishment of two houses of reform, one for boys and the other for girls, to be governed by a board of trustees consisting of six persons,—three women and three men. The corporate name fixed by the act is "The Board of Trustees of the Houses of Reform." The board were given power to take and hold in trust for the State any grant of land, donation or bequest of money or other property, made for the use of the institution in procuring a site for its buildings. The

objects of the incorporation of the institution were declared to be to establish a place of detention, and for the reformation of those juveniles who by vicious conduct and depravity had rendered themselves disgraceful to their families and society, and who might, under the provisions of the act, be admitted to the institution. Elaborate provision is made that by means of kind and firm treatment and education the inmates so committed may be reclaimed, and that, instead of being educated in crime, they shall be educated to usefulness. It is provided in the act that whenever any boy or girl should be brought before a circuit court or county court, or police court in cities of the first or second class, being under the age of eighteen years, it should be lawful for such court, in its discretion, to commit such boy or girl to such houses of reform for a period not exceeding the minority of the child, upon the complaint of the parent or guardian, supported by satisfactory evidence that the child was incorrigible and of vicious conduct, etc.; second, or upon a similar complaint made by any peace officer or citizen, when sustained by such evidence, and the further fact that the parent or guardian of such child was of immoral character, etc.; third, upon conviction in any of said courts of any crime against the laws of the State or ordinance of any city, the punishment being fixed at imprisonment for fifteen days or more; fourth, any boy or girl under the age of eighteen years who should be arrested charged with the commission of a crime, the conviction of which would subject it to imprisonment, the judge of the trial court was empowered, by consent of the accused or his parent or guardian, to subject the accused to such confinement; fifth, the grand jury, upon being satisfied that there was sufficient evidence to put the accused upon trial for a crime or a misdemeanor, may report to the

Board Trustees House of Reform v. City of Lexington.

court, in writing, recommending such infant to the house of reform, and, if the court should be satisfied from the evidence that such commitment would be proper, it had the power to order it.    The city of Lexington, by a resolution of its general council approved September 10, 1897, before the location of the houses of reform, and before the board had selected a site therefor, offered to the board that, in the event either one or both of said houses should be located not further than five miles from Lexington, said city would donate $5,000 to help defray the expenses for a suitable location and for the erection of suitable buildings; said donation to be paid in five years, in installments of $1,000 per year, without interest.    The city reserved in the proposition the right to send any one to said houses of reform by order of the judge of the police court of said city.    This proposition was accepted.    Both houses of reform were located within five miles of the city of Lexington, and about 200 acres of land purchased as a site.    The houses have been built, and their location is as permanent as such an institution could be made in the nature of things. The city entertaining doubts as to the legality of its donation of $5,000, the appellant board of trustees brought this suit in the Fayette circuit court against the city of Lexington to compel it to make appropriate provisions for paying the installments that had accrued, and none of which had been paid.    A demurrer was sustained to the petition, and it was dismissed, because, in the opinion of the court below, the action of the general council was in violation of section 179 of the Constitution of this State.    That section is as follows:    "The General Assembly shall not authorize any county or sub-division thereof, city, town, or incorporated district, to become a stockholder in any company, association or corporation, or to obtain or appropriate any

Board Trustees House of Reform v. City of Lexington.

money for, or to loan its credit to, any corporation, associa-
tion or individual, except for the purpose of constructing
or maintaining bridges, turnpike roads, or gravel roads:
provided, if any municipal corporation shall offer to the
Commonwealth any property or money for locating or
building a capitol, and the Commonwealth accepts such of-
fer, the corporation may comply with the offer." The city
of Lexington is a city of the second class. The enacting
clause (section 3038, Kentucky Statutes), provides: "The
cities of Covington, Newport and Lexington are hereby
declared to be cities of the second class, and the inhabitants
thereof, and of such other cities as may hereafter be de-
clared cities of the second class, respectively, are created
and continued bodies-corporate and politic, within their re-
spective limits, with perpetual succession, by the name and
style which each now respectively bears, with power to
govern themselves in all fiscal, prudential and municipal
concerns by such ordinances and resolutions as they may
deem proper, not in conflict with this act or the Constitu-
tion of the State of Kentucky or the Constitution of the
United States; to acquire property for municipal purposes,
by purchase or otherwise, within their corporate limits or
elsewhere; to hold the same and all property and effects
now belonging to the said cities, held either in their own
name or in the name of others, for the use of each of said
cities, for the purpose and interest for which the same were
granted or dedicated; to use, manage, improve, sell, con-
vey, rent or lease the same," etc. By subsection 3 of sec-
tion 3058, enumerating the powers of cities of the second
class, it is declared that the general council shall have
power by ordinance to provide for the levying, assessment,
and collection of taxes upon all property made taxable for
State purposes within the limits of the city, and not ex-

empted by general law from municipal taxation. By the sixteenth subsection of section 3058, express authority is given to cities of the second class to establish, erect, and maintain a city prison, a workhouse, a house of correction, a house of refuge, and all other municipal buildings; make all needful regulations and appoint all proper persons and assistants therefor; to purchase, rent, or lease within the limits of the city or elsewhere any real or personal property for the use of the city; and to control, manage, improve, sell, lease, or otherwise dispose of the same for such purposes and considerations as they may deem proper for the public welfare. By subsection 25 of section 3058, power is granted "to pass all such ordinances, not inconsistent with the provisions of this act or the laws of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city, and its trade, commerce and manufactures, and to enforce the same by fines and penalties; and any enumeration of subjects and matters herein to be regulated shall not be construed as a limitation upon this general power."

It will be seen from the foregoing that the city of Lexington, as a city of the second class, had express power—First, to acquire property for municipal purposes, by purchase or otherwise, within its corporate limits or elsewhere; second, to provide by ordinance for levying and collecting taxes upon all property within the city limits made taxable for State purposes, for the purpose of meeting the legitimate municipal expenses; third, to establish, erect, and maintain a city prison, a workhouse, a house of correction, and a house of refuge, and to that end to purchase, erect, or lease within the limits of the city or elsewhere any real or personal property for the use of the city; and, fourth, to pass all such laws, not inconsistent

with the provisions of its charter or the laws of Kentucky, as may be expedient in maintaining the peace, good government, health, and welfare of the city. It would therefore seem that if the city of Lexington had, at an expenditure of $5,000 or any other sum within the discretion of its general council, purchased or leased property, and built thereon or leased buildings, for the purpose of maintaining a house of refuge or reform for its juvenile criminals, or for refractory, unmanageable, or vicious juveniles of the class enumerated in the statute, it would undoubtedly have had such right, even to the extent of locating the buildings outside of the city limits. The fact that the city is given the right to lease property for the purpose of maintaining a workhouse, house of correction, or house of reform, would indicate that the city is permitted, to some extent, at least, to employ other agencies than its own in the execution of that part of its municipal duty involved in the custody and care of its criminal classes. But, further than this, we take notice that governing bodies not infrequently avail themselves of independent agencies in the exercise of governmental functions; that is, independent agencies in the sense that the person employed is one distinct from the State in its identity and character. This is especially true in the matter of the treatment of lunatics, where the State has provided that the trustees of asylums are bodies corporate, with powers to contract, to own property, and to sue and be sued in the corporate name. It is also true, in a sense, of the State college.

Since the adoption of the present Constitution, this court had before it a question similar in some of its features to the one at bar, in the case of Norman v. Board, 93 Ky., 537 (14 R., 529), (20 S. W., 901), (18 L. R. A., 556.) In that case there was

involved a question whether an appropriation of $100,000 made by the Legislature for the benefit of the Kentucky board of managers of the World's Fair, to enable it to make an exhibit of the resources of our State at that exposition, was in contravention of the Constitution, section 177 of which provides: "The credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the State; nor shall the Commonwealth become an owner or stockholder in, or make donation to, any company, association, or corporation; nor shall the Commonwealth construct a railroad or other highway." Section 171 of the Constitution says: "Taxes shall be levied and collected for public purposes only." We held that the appropriation in question was public in character, and calculated and intended to benefit the entire State. Said the court: "It is not a loaning of the credit of the State, and, therefore forbidden by it. The commissioners selected to expend the money are merely the State's agents to do so, and provide the exhibit for the benefit of its people. The Legislature had the power to provide the means for such a purpose." As a further side light of legislative intention in conferring powers upon municipalities with reference to such institutions, we may note that section 4876 of the Kentucky Statutes provides that the county court of any county, and the council or board of trustees of any city in it, may contract for their joint use of property used for a workhouse; and section 4878 provides that any two or more counties may jointly contract for such institutions. The case of Shepherd's Fold of Protestant Church v. Mayor, etc., of City of New York, 96 N. Y., 137, is sufficiently in point to be of value in determining the question before us. The case appears to have been decided on

the main question as to the constitutionality of the annual appropriation by the city for the benefit of appellant. It further appears that the objects of the corporation, the Shepherd's Fold, were to receive and adopt children of both sexes between the ages of 12 months and 15 years, who were orphans, half orphans, or otherwise friendless, and to keep, support, and educate them, and apprentice or place them out at service, trades, and schools. Also to receive children of poor clergymen for training and education, etc. It does not appear that these objects were limited or confined in their operation to such orphans or children of poor clergymen who lived in New York City. By act of the New York Legislature of 1868, the several magistrates of New York City were authorized to commit to the charge of this society such orphans and friendless children as might come under their jurisdiction. An annual tax of $5,000 was levied and collected in the city of New York for the support of this Shepherd's Fold Society, and which was resisted upon constitutional and other grounds. Said the court in that case: "Having the authority to commit to the charge of the plaintiff the specified class of the poor, it was no more than just that the city should make a reasonable contribution to the expenses of the plaintiff to enable it to perform the duty authorized to be assigned to it." Involved in that case was the following constitutional provision of New York: "Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking. This section shall not, however, prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as it may deem proper. Nor shall it apply to any fund or property now held or which

Board Trustees House of Reform v. City of Lexington.

may hereafter be held by the State for educational pur-
poses." The court said: "Carrying out the designated
charities through the instrumentality of private corpora-
tions is not prohibited by the Constitution, but the giving
away of the money, either of the State, or of its counties
or other local divisions, to individuals or private corpora-
tions, except for the designated purposes for which each is
authorized to provide, is forbidden. . . . Having the
authority to commit to the charge of the plaintiff the spec-
ified class of the poor, it is no more than just that the city
should make a reasonable contribution to the expenses of
the plaintiff to enable it to perform the duty authorized to
be assigned to it." The latter clauses of the section
quoted above from the New York Constitution seem to us
to be but declaratory of inherent powers of government
belonging to the State. It is a doctrine familiar to the
courts and lawmaking bodies that municipal corporations
may exercise all the powers within the fair intent and
purpose of their creation which are reasonably appropri-
ate to give effect to the powers expressly granted. In do-
ing this, they must, unless restricted in this respect, have
a choice of means adapted to ends, and are not to be con-
fined to any one mode of operation. Dill. Mun. Corp., (3d
Ed.) sections 91, 115, 446; City of Coldwater v. Tucker, 24
Am. Rep., 601. We have no difficulty in finding that where
an express authority or power is given a city to maintain,
within or without its limits, at her own cost, a house of
refuge, there is carried with it, the power to do less, pro-
vided in the doing less the same end is accomplished.
City of Mt. Carmel v. Shaw. 155 Ill., 37 (39 N. E., 584), (27
L. R. A., 580), (46 Am. St. Rep., 311). In the case at bar,
express authority having been given to the general council
of the city to take such action as may be necessary for the

Board of Trustees House of Reform v. City of Lexington.

care, custody and control of its criminal and dependent classes, it would seem that the city might, in the fair, reasonable exercise of its discretion and judgment in bringing about the result contemplated by the statute, employ other and independent agencies, and in doing this to pay what would be no more than a fair and just compensation for the services rendered it in this respect. This does not violate the section of the Constitution prohibiting it from loaning its credit or donating money to corporations or individuals. It does not loan its credit to any person or corporation; nor does it, in any proper sense of the word, donate money to such. On the contrary, it provides for itself, by express contract, convenient, comfortable, and suitable quarters, within its immediate locality, in every sense complying with the requirements of the statute affecting its duty in this respect. It pays for what it gets. Its points of advantage over other localities of the State are proximity, affording easy access and quick communication, and opportunity and privilege of frequent inspection. The clause in its proposal by which it secures to itself the unconditional right to have entered in the house of reform such as may be sent there by its police court may become of peculiar value, in the event of a change of the laws respecting permission to municipalities to have their criminals cared for at this institution.

It will be observed that in the act establishing houses of reform the privilege is accorded to all cities of the second class to send their criminals and incorrigible youth to this institution. However, this is not mandatory upon the municipalities. It is left to the discretion of their courts, and wisely so. At the same time, these cities are given the right, and in one sense it may be said to be their duty, to provide institutions of their own, suitable for the detention and correction of this class of lawbreakers, un-

less they may deem it better, in carrying out the object of the laws respecting these people, to confine them in the general public institutions.    The locality of the latter, the method of treatment of inmates, the system of govern-- ment and training, location with reference to healthfulness, etc., may all be, and doubtless are, points considered by the municipalities affected before availing themselves of the privileges of the statute.    Modern legislation has hu-- manely undertaken to treat this class of so-called crimin-- als upon the theory that they are reclaimable, and there- fore much depends upon the place of confinement and its methods.    We can not say that it is not a material advan- tage to a city of the second class, such as the city of Lex-- ington, to have an institution so located that she may at all times, and with slight expense and effort, keep a kind of surveillance over such of its inmates as were of her in- habitants.

We are of opinion that section 179 of the Constitution was designed especially to prevent municipalities from be- coming stockholders in, or lending their credit to, or mak-- ing donations of public property and taxes to, private en- terprises, or those which at best were but *quasi* public. To hold that a branch of government, such as a county or city, could not exercise a governmental function required of it by the law, by employing the service to be done, such as the care of the smallpox patients in a hospital owned by a corporation other than the city, or that it might not buy a supply of water for the public use from a corporation without the city having the means of furnishing it to the city, would be to place a narrow and restricted construc- tion upon the section, not warranted by the evils existing at the time of its adoption, and which were manifestly sought to be cured by the convention, as well as to mate--

rially hamper municipal subdivisions of state in the exercise of necessary powers and discretion in government. Furthermore, whatever doubts may be existing concerning the constitutionality of the act in question, must, under familiar and wise rules of construction, be resolved in favor of its constitutionality. And especially should this be so when such construction tends to support a highly beneficent object, well worthy of the care and attention that government has given it.

The judgment is reversed, and the cause remanded for proceedings consistent with this opinion.

Chief Justice Paynter and Judges Hobson and Guffy dissenting.